## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ERIC L. LAWTON, Derivatively on Behalf of LIME ENERGY CO., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| JOHN O'ROURKE, JEFFREY MISTARZ, DAVID ASPLUND, GREGORY BARNUM, CHRISTOPHER CAPPS, WILLIAM CAREY, JR., JOSEPH DESMOND, STEPHEN GLICK, PRADEEP KAPADIA, RICHARD KIPHART, DANIEL PARKE, and DAVID VALENTINE, | ) ) ) ) ) ) ) ) | Case No. |
| Defendants, | ) ) ) | **DEMAND FOR JURY TRIAL** |
| -and- | ) ) | |
| LIME ENERGY CO., A Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Eric L. Lawton, derivatively on behalf of Lime Energy Co. ("Lime Energy" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants John O'Rourke, Jeffrey Mistarz, David Asplund, Gregory Barnum, Christopher Capps, William Carey, Jr., Joseph Desmond, Stephen Glick, Pradeep Kapadia, Richard Kiphart, Daniel Parke, and David Valentine (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Lime Energy, gross mismanagement, abuse of control, and unjust enrichment. In support thereof, Plaintiff hereby alleges as follows:

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action which seeks to remedy wrongdoing committed by Lime Energy's directors and officers between May 14, 2008 and the present (the "Relevant Period").  During this time, the Individual Defendants breached their fiduciary duties as officers and directors of Lime Energy by causing the Company to issue false or misleading statements that misreported the Company's revenues and income.  The Individual Defendants also breached their fiduciary duties by falsely representing that Lime Energy maintained adequate internal controls when, in fact, the Individual Defendants knew that such controls were materially deficient.  The lack of adequate internal controls has caused the Company to misrepresent its record results and growth through false or misleading reporting of revenues and income, thereby violating Generally Acceptable Accounting Principles ("GAAP") and the Company's own internal accounting standards.  These violations have subjected the Company to multiple lawsuits and have already cost, and will continue to cost, the Company millions of dollars.

2.      Nominal Defendant Lime Energy is a Delaware corporation that provides clean energy solutions to the utilities, energy service companies, government entities, and commercial and industrial businesses.  The Company was formed as a result of a series of acquisitions by Electric City Corp. of Illinois, which was subsequently renamed.  During substantial portion of the Relevant Period, the Company was headquartered in Elk Grove, Illinois.  The Company moved its headquarters to North Carolina in 2011.

3.      In 2010, in an effort to increase profitability for a company that had been unprofitable until then, the Company's executive team (comprised of Defendants O'Rourke and Mistarz) developed a three-year strategic plan aimed at "increase[ing] [the Company's] profitability and revenue by focusing sharply on continuing to develop and expand [its] utility partnerships around the country."  This strategic plan was approved by the Company's Board of Directors (the "Board").

4.     Lime Energy, however, was ill-equipped to execute the strategic plan and to integrate the businesses that were acquired when the new Company was formed. During the Relevant Period, the Individual Defendants knowingly or recklessly disregarded the Company's lack of accounting systems and internal controls when consolidating the financial statements of the newly-acquired businesses and in assuring the market that the financial statements were accurate. The Individual Defendants knowingly or recklessly permitted non-existent revenues to be recorded in the Company's financial statements. The Individual Defendants also knowingly or recklessly permitted the Company to list revenue in earlier quarters than it was earned. Throughout this whole time, the Individual Defendants continued to misrepresent to the public that the Company was reaping "record earnings" and achieving record results and growth.

5.      In addition, the Individual Defendants knowingly or recklessly misrepresented that the Company's financial statements could be relied upon. The Individual Defendants also knowingly or recklessly failed to disclose to the investing public the truth about the Company's lack of adequate internal controls.

6.     As a result of Lime Energy's lack of internal controls and the Individual Defendants' unwillingness to disclose the failure of the Company's strategic plan to boost profitability, the Company misrepresented revenues and income. The Individual Defendants caused the Company to create an illusion of profitability by reporting revenues that were never earned as well as recognizing revenue in earlier quarters than it was earned. This permitted the Company to misrepresent its record results and growth.

7.     As a result of the Individual Defendants' materially false or misleading statements, the price of Lime Energy's common stock was artificially inflated during the Relevant Period, reaching a high of $10.10 per share on May 14, 2008.

8.     On July 17, 2012, the Company issued a press release announcing that its consolidated financial statements on Form 10-K for the periods ended December 31, 2010 and December 31, 2011 and quarterly report on Form 10-Q for the period ended March 31, 2010 could no longer be relied upon.

9.     Specifically, the Company stated that "**[i]n some cases, it appears that non-existent revenue may have been recorded**" and that "**[i]n other cases, it appears that revenue may have been recorded earlier than it should have been**."  The Company indicated that the misreporting may require restatement of all of the affected financial statements.  Moreover, although the Company could not make a reliable estimate of the magnitude of the misreported revenue, it stated its belief that "the cumulative adjustment to revenue for the affected financial statements will not exceed $15 million."

10.     The market reacted swiftly.  In just one day, shares of the Company's common stock fell $0.91 per share, or 45%, to close at $1.12 per share on July 17, 2012.

11.     As Garvin Jabusch, Co-Founder and CIO of Green Alpha Advisors and manager of the Sierra Club Green Alpha Portfolio, explained in the aftermath:

> "***The revelation that the company may have recorded "non-existent revenue" is a major concern.***  Somewhat less concerning is "Revenue being reported earlier that it should have been," which is a violation of the matching principle, and is a relatively easy mistake to make and can be readily forgiven if properly restated.  ***But the term "non-existent revenue" is a major red flag...*** There are only a couple of reasons phantom revenue could get booked, and most firms have controls in place to make sure that sources of revenue are verified before they're booked.  ***So at the very least, we can say that there are material weaknesses in LIME's internal controls.  At worst, some relatively senior person may have misinformed the accounting team.***"

12.     Jabusch's concerns were echoed by other analysts.  For example, on July 17, 2012, Forbes published an article entitled "What Lime Energy's Earnings Restatement Means." In the article, analyst Tom Konrad stated:

> ***Moving revenue forward to create the illusion of faster growth is far from harmless***, as it leads to nasty surprises on future dates, when the expected revenue should have been recorded, but is no longer there.  Recording revenue early is a fairly common form of book-fiddling, because the timing of revenue recognition always comes down to a judgment call.  Despite numerous accounting guidelines designed to ensure consistency in revenue recognition, it's always possible to tell oneself that recording revenue sooner is not really improper, even when it is. Most people like to think they are honest, and so they tend to use those forms of deception about which they can lie to themselves while they are lying to others.

> ***Recording non-existent revenue is a different beast altogether. If some "non-existent revenue may have been recorded," as the press release states, we're likely dealing with more than aggressive accounting.*** Although the company currently believes "that the cumulative adjustment to revenue for the affected financial statements will not exceed $15 million" in revenues, ***I would not be surprised if the book-fiddling turns out to [be] much more extensive than misreporting of $15 million in revenue***.

13. Konrad's prediction that the book-fiddling might be "much more extensive than misreporting of $15 million in revenue" turned out to be correct. On December 27, 2012, the Company issued a press release making additional disclosures concerning its misstated financial statements. The Company indicated that its consolidated financial statements on Form 10-K for the years ended December 31, 2008 and December 31, 2009 may also no longer be relied upon.

14. The Company determined that "some portion of the Company's revenue for 2009 and 2008 was recognized earlier than permitted under the generally accepted accounting principles." The Company could not make a reliable estimate of the magnitude of the misreported revenue in 2008 or 2009. It did indicate, however, that it expected that the misreporting will require restatement of the 2009 financial statements, in addition to the restatement of the 2010-2012 financial statements.

15. In reaction to the December 27, 2012 disclosure, shares of the Company's stock fell approximately 7%, to close at $0.56 per share the following day.

16. To date, the Company has not issued restatements of any of its prior financial statements. The Company has also failed to file its Quarterly Reports on Form 10-Q for the periods ending June 30, 2012 and September 30, 2012, which has put the Company's common stock in jeopardy of trading suspension and delisting from NASDAQ.

17. The Individual Defendants, as past and present members of the Executive Team and the Board, have knowingly or recklessly breached their fiduciary duties of good faith, fair dealing, and candor, and failed to control and manage Lime Energy in a fair, just, honest, and equitable manner to the best of their abilities.

18.     The Board allowed several of the Company's directors and its Chairman Asplund to resign, instead of pursing any action against them. Moreover, Asplund, although resigning as the Board's Executive Chairman for "health reasons," stayed on as a director on the Board.

19.     In light of their conduct, which has subjected the Company to being named as a defendant in a federal securities class action, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

20.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or reckless breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

21.     Jurisdiction is conferred by 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' preparation and/or dissemination of false or misleading information—occurred in this district, and the Individual Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this district.

23.     Each Defendant has minimum contacts with Illinois, as they have entered into contracts in Illinois, or have frequently traveled here, on Lime Energy business, or have authorized acts and actions that have had a sufficient impact in Illinois or on Lime Energy's shareholders and investors residing here to justify the exercise of jurisdiction over them.

## THE PARTIES

24.     Plaintiff Eric L. Lawton is a current shareholder of Lime Energy. Plaintiff has been a shareholder of Lime Energy since June 8, 2009, and has continuously held his Lime Energy stock at all relevant times. Plaintiff is a citizen and resident of Maryland.

25.     Nominal Defendant Lime Energy is a Delaware Corporation with its principal place of business located at 16810 Kenton Drive, Suite 240, Huntersville, North Carolina 28078.  Prior to August 2011, Lime Energy's principal executive offices were located at 128 Landmeier Road, Elk Grove Village, Illinois 60007.   During the Relevant Period, the Company's stock was listed and traded on the NASDAQ Exchange under the ticker "LIME." Lime Energy is a citizen of the States of Delaware and North Carolina.

26.     Lime Energy provides clean energy solutions to the utilities, energy service companies, government entities, and commercial and industrial businesses.  Its services include upgrading facilities to have energy efficient lighting, energy efficient mechanical systems, water conservation, and on-site renewable energy.   The Company consults, develops, and manages the process of constructing clean energy solutions for customers.

27.     Defendant John O'Rourke was the Company's COO since 2009 until 2011 and was and is the Company's President and CEO since May 23, 2011.  O'Rourke has been a Director of the Company since July 28, 2011. Upon information and belief, O'Rourke is a citizen of Illinois.

28.     Defendant Jeffrey Mistarz was, at all relevant times, Executive Vice President, Chief Financial Officer, Treasurer, and Corporate Secretary of Lime Energy.   Upon information and belief, Mistarz is a citizen of Illinois.

29.     Defendant David Asplund was the Company's CEO from January 2006 until May 23, 2011, at which time he was appointed as the Chairman of the Board.  He resigned from his position as Chairman of the Board on May 29, 2012.  On January 3, 2013, he filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code with the United States Bankruptcy Court for the Northern District of Illinois which was assigned Case No. 13-00177.  Upon information and belief, Asplund is a citizen of North Carolina.

30.     Defendant Gregory Barnum has been a Director of the Company since March 2006 and member of the Audit Committee.   The Board of Directors has determined that

Barnum qualifies as an "audit committee financial expert" as defined in Item 407(d)(5) of SEC Regulation S-K. Upon information and belief, Barnum is a citizen of North Carolina.

31. Defendant Christopher Capps was, at all relevant times, a Director of the Company and a member of the Audit Committee since 2011. Upon information and belief, Capps is a citizen of North Carolina.

32. Defendant William Carey, Jr. was a Director of the Company beginning in March, 2006. Carey resigned from his position as Director on January 5, 2012. Upon information and belief, Carey is a citizen of Illinois.

33. Defendant Joseph Desmond was a Director of the Company beginning in January, 2007 and member of the Audit Committee at all relevant times. Desmond resigned from his position as Director on April 27, 2012. Upon information and belief, Desmond is a citizen of Illinois.

34. Defendant Stephen Glick has been a Director of the Company since July 2009. Upon information and belief, Glick is a citizen of North Carolina.

35. Defendant Pradeep Kapadia was a Director of the Company beginning in July, 2011. Kapadia resigned from his position as Director on January 3, 2012. Upon information and belief, Kapadia is a citizen of California.

36. Defendant Richard Kiphart was, at all relevant times, a Director of the Company and the Chairman of the Board from 2006 until 2011, when he was replaced by Asplund, and again from May 29, 2012, when he replaced Asplund. Kiphart is the Company's largest stockholder and the beneficial owner of over 40% of the Company's common stock. Upon information and belief, Kiphart is a citizen of Illinois.

37. Defendant Daniel Parke was a Director of the Company beginning in October, 2005. Parke resigned from his position as Director on January 6, 2012. Upon information and belief, Parke is a citizen of Illinois.

38. Defendant David Valentine was a Director of the Company beginning in May 2004 and a member of the Audit Committee beginning 2006. Valentine resigned from his

position as Director on December 31, 2010. Upon information and belief, Valentine is a citizen of Illinois.

39.     Defendants O'Rourke, Mistarz, Asplund, Barnum, Capps, Carey, Desmond, Glick, Kapadia, Kiphart, Parke, and Valentine are collectively referred to as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE DEFENDANTS

40.     By reason of their positions as officers, directors, and fiduciaries of Lime Energy and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Lime Energy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and manage Lime Energy in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

41.     Each director and officer of the Company owed and owes to Lime Energy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

42.     The Individual Defendants, because of their positions of control and authority as directors and officers of Lime Energy, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained herein.

43.     To discharge their duties, the Individual Defendants, as officers and directors of Lime Energy, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the charter and bylaws of Lime Energy;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Lime Energy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Lime Energy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lime Energy's operations would comply with all laws and Lime Energy's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.     Each Individual Defendant, by virtue of his or her position as a director or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lime Energy, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.   The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Lime Energy's Board at all relevant times.

45.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.   Accordingly, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

46.     At all times relevant hereto, the Individual Defendants were the agents of each other and were at all times acting within the course and scope of such agency.

## Generally Accepted Accounting Principles

47.     In issuing its financial statements, Lime Energy was required to comply with the generally accepted accounting principles ("GAAP")—a common set of accounting principles, standards, and procedures recognized by the accounting profession and used to compile financial statements.

48.     According to Lime Energy's Form 10-K, the Company has historically recognized revenue "primarily on a completed contract basis," which meant that revenue was recognized "once the project is substantially complete, resulting in some variability in revenue."

49.     Upon the consolidation of the Company's systems and accounting activities in 2011, Lime Energy reported that it "began accounting for all of [its] projects on a percentage of completion basis." Under both methods of revenue recognition, "any anticipated losses on contracts" are required to be charged to operations "as soon as they are determinable."

50.     In reality, however, Lime Energy had failed to properly adhere to either method of revenue recognition during the Relevant Period.

**Lime Energy's internal policy regarding revenue recognition**

51.     Lime Energy's Form 10-K for the year ending in 2008 provided the following with respect to the Company's "Revenue and Profit Recognition":

> We recognize our revenue when all four of the following criteria are met: (i) persuasive evidence has been received that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collectability is reasonably assured. ***In addition, we follow the provisions of the SEC's Staff Accounting Bulletin No. 104, Revenue Recognition, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance.*** Any amounts received prior to satisfying our revenue recognition criteria are recorded as Billings in Excess of Costs and Estimated Earnings on Uncompleted Contracts.

> Historically, we have recognized revenue primarily on a completed contract basis. Under the completed contract method, revenue is recognized once the project is substantially complete, resulting in some variability in revenue. This method works well with projects that are smaller and shorter in duration. AEM, however, recognizes, and will continue to recognize, all of its revenue on a percentage of completion basis. AEM's projects generally are larger in terms of revenue and longer in duration; therefore, AEM recognizes revenue throughout the term of the project on a percentage of completion method based on the percentage of costs incurred. This accuracy of the estimates generated using this method is dependant on our ability to accurately estimate the remaining cost to complete the project. Because AEM represented approximately 54% of our 2008 revenue, we expect at least for the near future that the majority of our revenue will be recognized on a percentage of completion basis. Under both methods of revenue recognition, any anticipated losses on contracts are charged to operations as soon as they are determinable.

52.     Lime Energy's Form 10-K for the year ending in 2009 provided the following with respect to the Company's "Revenue and Profit Recognition":

> We recognize our revenue when all four of the following criteria are met: (i) persuasive evidence has been received that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collectability is reasonably assured. ***In addition, we follow the provisions of the SEC's Staff Accounting Bulletin No. 104, Revenue Recognition, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance.*** Any amounts received prior to satisfying our revenue recognition criteria are recorded as deferred revenue.
>
> Historically, we have recognized revenue primarily on a completed contract basis. Under the completed contract method, revenue is recognized once the project is substantially complete, resulting in some variability in revenue. This method works well with projects that are smaller and shorter in duration. AEM, however, recognizes, and will continue to recognize, all of its revenue on a percentage of completion basis. AEM's projects generally are larger in terms of revenue and longer in duration; therefore, AEM recognizes revenue throughout the term of the project on a completion method based on the percentage of costs incurred. As a result of the acquisition of AEM, we expect that the majority of our revenue will be recognized on a percentage of completion basis. Under both methods of revenue recognition, any anticipated losses on contracts are charged to operations as soon as they are determinable.

53.     Lime Energy's Form 10-K for the year ending in 2010 provided the following with respect to the Company's "Revenue and Profit Recognition":

> We recognize our revenue when all four of the following criteria are met: (i) persuasive evidence has been received that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; and (iv) collectability is reasonably assured. ***In addition, we follow the provisions of the SEC's Staff Accounting Bulletin No. 104, Revenue Recognition, which sets forth guidelines in the timing of revenue recognition based upon factors such as passage of title, installation, payments and client acceptance.*** Any amounts received prior to satisfying our revenue recognition criteria are recorded as deferred revenue.
>
> Historically, we have recognized revenue primarily on a completed contract basis. Under the completed contract method, revenue is recognized once the project is substantially complete, resulting in some variability in revenue. This method works well with projects that are smaller and shorter in duration. Our public sector markets, however, recognize, and will continue to recognize, all of its revenue on a percentage of completion basis. Projects in our public sector market are generally larger in terms of revenue and longer in duration; therefore, we therefore recognize revenue throughout the term of the project on a completion method based on the percentage of costs incurred. Approximately half of our revenue is recognized on a percentage of

completion basis. Under both methods of revenue recognition, any anticipated losses on contracts are charged to operations as soon as they are determinable.

54.     Lime Energy's Form 10-K for the year ending in 2011 provided the following with respect to the Company's "Revenue and Profit Recognition":

> Historically, we have recognized a portion of our revenue on a completed contract basis. Under the completed contract method, revenue is recognized once the project is substantially complete, resulting in some variability in revenue. This method is most appropriate for use with projects that are smaller and shorter in duration. Our public sector markets, however, recognize all of its revenue on a percentage of completion basis. Projects in our public sector market are generally larger in terms of revenue and longer in duration; therefore we recognized revenue throughout the term of the project on a completion method based on the percentage of costs incurred. The consolidation of systems and accounting activities in 2011 permitted us to better make and monitor estimates that are sufficiently dependable to justify the use of the percentage of completion method of accounting. Therefore during 2011, we began accounting for all of our projects on a percentage of completion basis. Under both methods of revenue recognition, any anticipated losses on contracts are charged to operations as soon as they are determinable.

**Individual Defendants caused Lime Energy to violate its internal policy and GAAP**

55.     Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC that are not prepared in accordance with GAAP "will be presumed to be misleading or inaccurate." During the Relevant Period, Lime Energy failed to comply with GAAP.

56.     Specifically, under GAAP, as set forth in the Statement of Financial Accounting Standards ("SFAS") 48 issued by the Financial Accounting Standards Board ("FASB"), revenue can only be recognized and booked in the period in which it is substantially earned.

57.     Similarly, FASB's Statement of Financial Accounting Concepts No. 5 ("FASB CON No. 5") provides that for revenue to be recognizable, it must be: (1) realized or realizable; and (2) earned.

58.     Likewise, the SEC's Staff Accounting Bulletin No. 104 on "Revenue Recognition," which establishes guidelines in the timing of revenue recognition based on factors such as passage of title, installation, payments, and client acceptance, states:

> *[R]evenue should not be recognized until it is realized or realizable and earned.* . . . [Concepts Statement 5,] Paragraph 84(a) [states that] "the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and

selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)." . . .

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,

- Delivery has occurred or services have been rendered,

- The seller's price to the buyer is fixed or determinable, and

- Collectibility is reasonably assured.

Some revenue arrangements contain multiple revenue-generating activities. The staff believes that the determination of the units of accounting within an arrangement should be made prior to the application of the guidance in this SAB Topic by reference to the applicable accounting literature.

59.     By causing the Company to record non-existent revenue and to record revenue before it was earned, the Individual Defendants not only violated the Company's own internal policy regarding revenue recognition, but they also violated GAAP by not complying with the following: (1) the SFAS 48, (2) the FASB CON No. 5, and (3) the SEC's Staff Accounting Bulletin No. 104.

60.     Because the Company's financial statements filed with the SEC were not prepared in accordance with GAAP, they are "presumed to be misleading or inaccurate" under Regulation S-X.

## **Reasonable and Prudent Supervision**

61.     To discharge their duties, the officers and directors of Lime Energy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Lime Energy were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how Lime Energy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that Lime Energy was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACH OF FIDUCIARY DUTIES

62.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Lime Energy and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Lime Energy, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lime Energy, the absence of good faith on their part, or a reckless disregard for their duties to Lime Energy and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Lime Energy.

63.     The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose that:

(1)     the Company was improperly recording revenue, including the creation of non-existent revenue and booking revenue in the earlier period than it was earned;

(2)     as a result, the Company's revenue and financial results were overstated;

(3)     the Company's financial statements were not prepared in accordance with GAAP;

(4)     the Company lacked adequate internal and financial controls; and

(5)     as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

In addition, as a result of the Individual Defendants' actions and course of conduct, the Company is now the subject of class action lawsuits that allege violations of federal securities laws.  As a result, Lime Energy has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

### Control, Access, and Authority

64.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lime Energy.

65.     Because of their advisory, executive, managerial, and directorial positions with Lime Energy, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Lime Energy.

66.     Each of the Individual Defendants was the agent of each of the other Defendants and of Lime Energy, and was at all times acting within the course and scope of such agency.

### Conspiracy, Aiding and Abetting, and Concerted Action

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that: (1) the Company was improperly recording revenue, including the creation of non-existent revenue and booking revenue in the earlier period than it was earned; (2) as a result, the Company's revenue and financial results were overstated; (3) the Company's financial statements were not prepared in accordance with GAAP; (4) the Company lacked adequate internal and financial controls; and (5) as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.  In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

69.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue false or misleading financial results based upon non-existent revenue or based on revenue that was improperly recorded in the earlier period than it was earned.

70.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, and unjust enrichment; and (2) disguise and misrepresent the Company's future business prospects.

71.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to falsely represent that the Company had adequate internal controls in place, and by purposefully, recklessly, or negligently causing the Company to release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

72.     Each of Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the

primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **FACTUAL ALLEGATIONS**

73.    Lime Energy describes itself as "a leading national provider of energy efficiency for small business customers."  It designs and implements direct install programs for a wide range of clients, including utilities, energy service companies, government entities, and commercial and industrial businesses.  As of February 25, 2008, Lime Energy's stock has been trading on the NASDAQ Capital Market under the ticker symbol "LIME."

74.    The conduct of all of the Company's officers, directors, and employees is governed by the Code of Business Conduct and Ethics (the "Code of Ethics").

75.    The Company's Audit Committee is responsible for "review[ing] transactions involving the Corporation and its officers, directors, affiliates and significant shareholders."  The conduct of the Audit Committee is governed by the Audit Committee Charter.

### **Code of Business Conduct and Ethics**

76.    The Code of Ethics governs the conduct of the Company's directors and officers, among others.  It provides that the "[t]he matters covered in this Code are of the utmost importance to the Company, its shareholders and its business partners, and are essential to the Company's ability to conduct its business in accordance with its stated values."

77.    The Code of Ethics requires all of the Company's employees (including directors and officers) to "follow specific guidelines in managing its records."  The Code of Ethics states that all of the Company's employees "must adhere to the Company's business and legal requirements in managing records, including all recorded information regardless of medium or characteristics."

78.    With regard to "Accounting Practices," the Code of Ethics specifically provides:

> The Company's responsibilities to its shareholders and the investing public require that all transactions fully and accurately be recorded in the Company's books and records in compliance with all applicable laws.  False or misleading entries, unrecorded funds or assets, or payments without appropriate supporting documentation

and approval strictly are prohibited and violate Company policy and the law. Additionally, all documentation supporting a transaction fully and accurately should describe the nature of the transaction and be processed and recorded in a timely fashion.

79.     With regard to the "Public Disclosure of Information," the Code of Ethics provides:

The federal securities laws require the Company to disclose certain information in various reports that the Company must file with or submit to the SEC.  In addition, from time to time the Company makes other public communications, such as issuing press releases.

The Company requires that its Chief Executive Officer, Chief Financial Officer and all other officers, directors and employees who are involved in the preparation of SEC reports or other public documents ensure that the information disclosed in those documents is full, fair, accurate, timely and understandable.

Moreover, if any such officer, director or employee becomes aware of any material information that he or she believes should be disclosed to the public in the Company's reports filed with the SEC, it is his or her responsibility to bring such information to the attention of the Chief Financial Officer or a member of the Audit Committee.  If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should report those concerns to a member of Senior Management or a member of the Audit Committee.

80.     Throughout the Relevant Period, in violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over accounting and financial reporting and consciously disregarded their duties to monitor such controls and accounting.  The Individual Defendants' complete failure to perform their duties in good faith resulted in fraudulent accounting practices and subsequent misrepresentations to the SEC, the investing public, and the Company's shareholders.

**Audit Committee Charter**

81.     During the Relevant Period, Defendants Barnum, Capps, Desmond, and Valentine served on the Company's Audit Committee.  As members of the Audit Committee, they had an affirmative duty of oversight and responsibility for the integrity of Lime Energy's financial reporting.

82.     The Company's 2012 Proxy Statement specifically noted that "[t]he Audit Committee oversees [the Company's] financial reporting process on behalf of the Board of Directors."

83.     The Company's Audit Committee is governed by the Audit Committee Charter, which provides that in addition to assisting the Company's Board with overseeing the Company's management, the Audit Committee is charged with overseeing the accounting and financial reporting processes of Lime Energy and the audits of the Company's financial statements.

84.     Specifically, the Audit Committee Charter provides that "[i]n carrying out its responsibilities, the audit committee will":

- Confirm and assure the independence of the independent auditors.

- In conjunction with such independent auditors, determine any services to be provided by the independent auditors and the related fees prior to such services being rendered.

- Recommend to the board of directors the appointment, retention or dismissal of the independent auditors to audit the financial statements of the Company and, with the board of directors, recommend to the Corporation's stockholders the ratification of such actions.

- Meet with the independent auditors and management of the Corporation to review the scope of the proposed audit for the current year and the audit procedures to be performed and provide oversight of independent auditors during the course of the audit.

- Meet with the independent auditors and management of the Company at the conclusion of the audit to review the results of the audit, including any comments or recommendations of the independent auditors, especially the contents of any auditors' letter to management.

- Review with the independent auditors and with the financial and accounting personnel the adequacy and effectiveness of the Company's internal controls and elicit any recommendations for improving the internal controls or particular areas where new or more detailed controls or procedures are desirable.

- Review legal and regulatory matters that may have a material effect on the financial statements.

- Inquire of management and the independent auditors regarding significant risks or exposures and assess the steps management has taken to minimize such risks and exposures to the Company.

- Review the financial statements contained in the annual report to shareholders with management and the independent auditors and, if appropriate, recommend to the board that such financial statements be adopted for inclusion in the Corporation's annual report to stockholders.

- Inquire of the independent auditors regarding their qualitative judgments about the appropriateness, not just the acceptability, of the accounting principles and the clarity of the financial disclosures. Also inquire of the auditors regarding their reasoning in accepting or questioning management's significant estimates, changes or proposed changes in accounting principles and disclosure practices management employs for new transactions or events. Resolve disagreements between management and the independent auditors regarding financial statement disclosure.

- Provide sufficient opportunity at all meetings of the audit committee for the independent auditors to meet with the members of the audit committee without members of management present. Among the items to be discussed in these meetings are the independent auditors' evaluation of the Company's financial personnel and the cooperation received by the independent auditors during the course of the audit.

- Consider whether audit committee members are provided with appropriate background information and training and, when necessary, seek such information and training from management or the independent auditors.

- Submit the minutes of all meetings of the audit committee to the board.

- Investigate any matter brought to its attention within the scope of its duties, with the power to retain outside counsel for this purpose if, in its judgment, that is appropriate. The costs of such counsel will be paid by the Corporation.

- Review the Company's proxy statement disclosure concerning the report of the audit committee and the independence of the members of the audit committee, include the audit committee charter as an exhibit to the Company's proxy statement at least once every three years (but not less than provided by Rule 101(a) of the Securities Exchange Act of 1934, as amended), review and reassess the adequacy of the audit committee charter on an annual basis and recommend any changes to the audit committee charter to the board.

- Verify that the Company's auditors have reviewed the Company's financial information prior to filing the Company's Form 10-Q Reports.

- Review and approve all related party transactions involving the Corporation and its officers, directors, affiliates and significant shareholders.

**Acquisition of AEM and the Company's Utility Division**

85.     Lime Energy acquired Applied Energy Management, Inc. ("AEM") in June 2008. AEM provided energy engineering and consulting services, as well as energy efficiency services that were similar to Lime Energy's pre-existing energy efficiency services.

86.     The Company began serving utility clients during 2009 and won its first contract to provide energy-demand management services later that year.

87.     During 2010, the Company established Lime Energy Asset Development, LLC ("LEAD") to fund, develop, and operate renewable and alternative energy assets.

88.     In 2011, the Company underwent significant restructuring and streamlining of its operations to reduce costs.  This included merging many of its subsidiaries, changing its name from Applied Energy Management, Inc. to Lime Energy Services Co., and moving its corporate headquarters from Elk Grove Village, Illinois to Huntersville, North Carolina.

89.     At about the same time, the Company began to devote more attention to its utility division.  In fact, during the Relevant Period, the Company's utility division accounted for a substantial portion of the Company's income and revenue.

90.     Throughout the Relevant Period, the Individual Defendants repeatedly referred to the size of the backlog in the Company's utility division as an indicator of future growth.

91.     The Company further confirmed the importance of its utilities division in its March 16, 2012 Form 10-K for the year ending December 31, 2011:

> During 2011, one utility customer accounted for approximately 21% of our consolidated billings while a public utility commission, the Army Corps. of Engineers and an ESCO combined to account for an additional 33% of our consolidated billings.  One utility customer accounted for approximately 17% of our consolidated billings during 2010, while two ESCO customers accounted for approximately 30% of the consolidated billings during 2009.

> We expect that contracts with large utilities or public utility commissions and ESCOs will continue to be a significant and growing source of revenue for us in the future, therefore we may experience greater client concentration in future periods than we have in the past.

92.     The Company also states the following in the "About Us" section on its website:

Lime Energy is building a new energy future. As a leading national provider of energy efficiency for small business customers, Lime designs and implements direct install programs for our utility clients which consistently exceed program savings goals. ***Our award-winning, integrated services programs provide utilities with reliable energy efficiency resources while delivering the highest levels of customer satisfaction.*** This next generation approach is helping utilities across the country to go deeper and broader with the cheapest, cleanest and fastest energy resource that we have – energy efficiency.

## False or Misleading Statements

93.     On May 14, 2008, Lime Energy issued a press release announcing its financial results for the first quarter of 2008, ending March 31, 2008. For the quarter, the Company reported revenues of $2.907 million and a GAAP net loss of $4.233 million, or $0.55 per share.

94.     In the May 14, 2008 press release, Defendant Asplund was quoted as saying:

Our first quarter financial results were consistent with our expectations for the period while at the same time we believe that new projects are in line to deliver the levels of growth we discussed during our 2007 year end reporting. . . . Over 75% of our revenue for the quarter came from our Energy Services segment where revenue increased approximately 30% over Q1 of 2007. Given that our revenues are highly seasonal, we fully expected our results to be lowest this period but then to begin to increase quarter-over-quarter and peak in the fourth quarter where we anticipate our 2008 annual growth to mirror 2007 vs. 2006.

. . . .

As we go through 2008 we believe we will begin to experience better operating margins. These margins should improve as a result of scale and efficiency which we believe we will begin to gain from our significant 2007 investment to consolidate, integrate and build out our sales platform.

95.     That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release. The Form 10-Q was signed by Asplund and Mistarz.

96.     Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based

on such evaluation, our chief executive officer and chief financial officer have concluded that, as of March 31, 2008, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

97.     Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended March 31, 2008 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

98.     On August 15, 2008, Lime Energy issued a press release announcing its financial results for the second quarter of 2008, ending June 30, 2008.  For the quarter, the Company reported revenues of $6.934 million and a GAAP net loss of $4.531 million, or $0.57 per share.

99.     In the August 15, 2008 press release, Defendant Asplund was quoted as saying:

Over the last two years, we have invested a substantial amount of money in building up Lime Energy which we believe has resulted in its becoming a formidable force in the energy efficiency marketplace.  With the addition of AEM, we now provide a diversified array of energy efficiency services and technologies to commercial and industrial companies, energy service companies and utilities on a truly national platform.  We expect these investments to result in improved financial performance through the rest of this year and into 2009.

100.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release.  The Form 10-Q was signed by Asplund and Mistarz.

101.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of June 30, 2008, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management,

including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

102.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended June 30, 2008 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

103.    On November 14, 2008, Lime Energy issued a press release announcing its financial results for the third quarter of 2008, ending September 30, 2008.  For the quarter, the Company reported revenues of $18.332 million and a GAAP net loss of $3.139 million, or $0.36 per share.

104.    Under "Financial Outlook," the November 14, 2008 press release provided:

The company is increasing its revenue guidance for the second half 2008 to between $45 million and $50 million from between $40 million and $45 million. Given third quarter results, the fourth quarter revenue estimate is therefore in a range of $27 million and $32 million.

105.    In the November 14, 2008 press release, Defendant Parke was quoted as saying:

Although we are very cognizant of the current difficult economic environment, we are comfortable increasing our revenue estimate at this time. . . . To date, we have not yet seen a slow down in our business with commercial or industrial customers and continue to bid, propose, develop and close new projects.

106.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release.  The Form 10-Q was signed by Asplund and Mistarz.

107.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of September 30, 2008, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our

management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

108.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended September 30, 2008 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

109.    On March 10, 2009, Lime Energy issued a press release announcing its financial results for the fourth quarter of 2008, ending December 31, 2008, as well as twelve-month period ending December 31, 2008.  For the quarter, the Company reported revenues of $29.049 million and a GAAP net loss of $1.421 million, or $0.16 per share.  For the year, the Company reported revenues of $57.222 million and a GAAP net loss of $13.324 million, or $1.59 per share.

110.    In the March 10, 2009 press release, Defendant Asplund was quoted as saying:

We are extremely pleased to report record revenues and the first quarter in our history with positive adjusted EBITDA. . . . This marks another key milestone achieved as we work to build Lime Energy into the leading energy efficiency and renewable energy solutions provider in the country.  In spite of an increasingly difficult economic environment, we continued to build upon our platform by hiring and training new employees, achieved a 194% increase in revenue for the year and continued to increase and diversify our customer base and our energy efficiency solution offerings. . . .  We believe our customer diversification and our diversified energy efficiency services create a solid, scalable business model to drive profitable growth as demonstrated in the fourth quarter.

111.    That same day, the Company filed its Form 10-K with the SEC repeating the earnings results from the press release.  The Form 10-K was signed by Defendants Asplund, Parke, Mistarz, Kiphart, Barnum, Carey, Desmond, and Valentine.

112.    Under "Disclosure Controls and Procedures," the Form 10-K provided:

Our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as amended) as of the end of the period covered by this report.  Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2008, our disclosure controls and procedures were effective.

113. Under "Management's Annual Report on Internal Control Over Financial Reporting," the Form 10-K provided, in relevant part:

> As of the end of the period covered by this report, our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our internal control over financial reporting. In carrying out its evaluation, our management used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2008.

114. Under "Changes in Internal Control Over Financial Reporting," the Form 10-K provided:

> There were no changes in our internal control over financial reporting during the quarter ended December 31, 2008 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

115. On May 12, 2009, Lime Energy issued a press release announcing its financial results for the first quarter of 2009, ending March 31, 2009. For the quarter, the Company reported revenues of $13.725 million and a GAAP net loss of $4.164 million, or $0.38 per share.

116. In the May 12, 2009 press release, Defendant Asplund was quoted as saying:

> The first quarter marked another record quarter of performance for Lime Energy, with revenue up 60% from the first quarter of 2008 on a pro forma basis. . . . This increase was across our customer base with sales to commercial and industrial customers more than doubling and revenue from federal, state and local governments through our ESCO partners increasing by more than 40%. In addition to top-line growth, we continued to see strong operating leverage over first quarter 2008 on a pro forma basis with gross margins increasing by over 30% while SG&A increased only 1.8% resulting in a 40% improvement in our quarterly adjusted EBITDA loss. . . .

> . . . Despite the continued difficult and uncertain environment, we have a large and growing base of corporate customers and ESCO partners and continue to sign contracts with new and existing customers. Therefore, we remain cautiously optimistic on the year and reaffirm our 2009 guidance.

117. That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release. The Form 10-Q was signed by Asplund and Mistarz.

118. Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of March 31, 2009, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

119.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended March 31, 2009 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

120.    On August 12, 2009, Lime Energy issued a press release announcing its financial results for the second quarter of 2009, ending June 30, 2008. For the quarter, the Company reported revenues of $15.795 million and a GAAP net loss of $4.054 million, or $0.36 per share.

121.    In the August 12, 2009 press release, Defendant Asplund was quoted as saying:

The second quarter marked another strong quarter of growth for Lime Energy. . . . Organic revenue was up 55% from the second quarter of 2008 on a pro forma basis which was particularly notable given a roughly 10% decline in revenue with our commercial and industrial customers due to the continued difficult economic environment but an almost 100% increase in revenue from the public sector which includes our ESCO partners working with federal, state and local entities. In addition to further top-line growth, we continued showing operating leverage over second quarter 2008 on a pro forma basis with gross margins increasing by 33% while SG&A decreased 5.7%, resulting in a 49% improvement in our quarterly adjusted EBITDA loss over the pro forma results from the second quarter in 2008.

122.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release. The Form 10-Q was signed by Asplund and Mistarz.

123.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended

(the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of June 30, 2009, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

124. Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended June 30, 2009 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

125. On November 12, 2009, Lime Energy issued a press release announcing its financial results for the third quarter of 2009, ending September 30, 2009. For the quarter, the Company reported revenues of $21.003 million and a GAAP net loss of $3.891 million, or $0.26 per share.

126. In the November 12, 2009 press release, Defendant Asplund was quoted as saying:

The third quarter marked another strong quarter of growth for Lime Energy. . . . We continued to grow revenue, show improved operating leverage and support new initiatives in engineering, utility program management and direct federal government contracting despite the continued challenging economic environment. Results were in line with expectations, with consolidated revenue up over 18% from the third quarter of 2008. Contributing to the increase was a 24% increase in revenue from our commercial and industrial (C&I) business and a 16% increase in our public sector work with our ESCO partners.

127. That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release. The Form 10-Q was signed by Asplund and Mistarz.

128. Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based

on such evaluation, our chief executive officer and chief financial officer have concluded that, as of September 30, 2009, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

129.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended September 30, 2009 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

130.    On March 23, 2010, Lime Energy issued a press release announcing its financial results for the fourth quarter of 2009, ending December 31, 2009, as well as twelve-month period ending December 31, 2009.  For the quarter, the Company reported revenues of $20.3 million and a GAAP net loss of $6.5 million, or $0.26 per share.  For the year, the Company reported revenues of $70.8 million and a GAAP net loss of $18.0 million, or $1.12 per share.

131.    In the March 23, 2010 press release, Defendant Asplund was quoted as saying:

2009 was a successful and a transitional year for Lime Energy. . . . We grew revenues by 8.7% and increased gross profit by 1.3% over 2008 pro-forma results, strengthened our balance sheet and launched several exciting new growth initiatives, all in spite of a difficult economic environment.  . . .

. . . .

2010 represents an exciting new year for Lime Energy. . . . We enter the year with a strong platform that provides a broad array of energy efficiency solutions to a diversified customer base.  Our balance sheet is the strongest it has been in the Company's history, having virtually no debt and approximately $23 million in cash.  Therefore, we believe we are well positioned to increase market share, grow revenue and realize significant operating leverage from the expected continued increase in demand for energy efficiency from both the public and private sectors.

132.    That same day, the Company filed its Form 10-K with the SEC repeating the earnings results from the press release.  The Form 10-K was signed by Defendants Asplund, Parke, Mistarz, Kiphart, Barnum, Capps, Carey, Glick, Desmond, and Valentine.

133.    Under "Disclosure Controls and Procedures," the Form 10-K provided:

> Our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2009, our disclosure controls and procedures were effective.

134.    Under "Management's Annual Report on Internal Control Over Financial Reporting," the Form 10-K provided, in relevant part:

> As of the end of the period covered by this report, our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our internal control over financial reporting. In carrying out its evaluation, our management used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2009.

135.    Under "Changes in Internal Control Over Financial Reporting," the Form 10-K provided:

> There were no changes in our internal control over financial reporting during the quarter ended December 31, 2009 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

136.    On May 13, 2010, Lime Energy issued a press release announcing its financial results for the first quarter of 2010, ending March 31, 2010.  For the quarter, the Company reported revenues of $11.8 million and a GAAP net loss of $4.7 million, or $0.20 per share.

137.    In the May 13, 2010 press release, Defendant Asplund was quoted as saying:

> Revenue from our utility business grew rapidly in the first quarter. . . . This is proving to be an exciting new growth area for us as utilities take a leading role in

delivering energy efficiency upgrades to their customers' facilities. We now have three contracts for the implementation of utility demand-side management programs which give us exclusive access to utility incentives which pay 70% to 80% of project costs in large geographic areas. We expect this to be a strong growth area in 2010 and beyond and believe our skill sets across program management, energy engineering, design and implementation provide us with all of the capabilities required to assist utilities in achieving their energy efficiency goals.

138.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release. The Form 10-Q was signed by Asplund and Mistarz.

139.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of March 31, 2010, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

140.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended March 31, 2010 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

141.    On August 10, 2010, Lime Energy issued a press release announcing its financial results for the second quarter of 2010, ending June 30, 2010. For the quarter, the Company reported revenues of $17.5 million and a GAAP net loss of $2.0 million, or $0.09 per share. The Company also reaffirmed its guidance for the year ending December 31, 2010.

142.    In the August 10, 2010 press release, Defendant Asplund was quoted as saying:

Our consolidated revenue for the second quarter of 2010 increased $1.7 million or 10.8% when compared to the year earlier period. . . . Revenue from our commercial and industrial business (C&I) declined slightly while revenue from our public sector markets was down approximately $3.6 million as compared to

the second quarter of 2009. Offsetting these declines was an increase of $4.5 million from our new utility program management business and $1.2 million earned under our new US Army Corp of Engineers contract. We began these new initiatives in late 2009 and believe they will generate meaningful revenue going forward. We expect conditions in our C&I and public sector markets to improve during the balance of the year. With an extensive breadth of energy efficiency and renewable energy solutions, a diversified customer base in the private, public and utility markets, a national footprint and a scalable infrastructure which we believe will deliver long term growth with consistent earnings, we remain very optimistic on the future and our growth opportunities in each of our markets.

143. That same day, the Company filed its Form 10-Q with the SEC repeating the

earnings results from the press release. The Form 10-Q was signed by Asplund and Mistarz.

144. Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of June 30, 2010, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

145. Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended June 30, 2010 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

146. On November 8, 2010, Lime Energy issued a press release announcing its

financial results for the third quarter of 2010, ending September 30, 2010. For the quarter, the

Company reported revenues of $28.1 million and a GAAP net loss of $382 thousand, or $0.02

per share. The Company also reconfirmed its guidance for the year ending December 31, 2010.

147. In the November 8, 2010 press release, Defendant Asplund was quoted as saying:

Our consolidated revenue for the third quarter of 2010 increased 33.7% when compared to the year earlier period demonstrating again the capability and

increasing momentum of our diversified service platform. . . . The majority of this increase was from our utility and US Army Corp of Engineers Federal Direct program initiatives which we believe will continue to generate meaningful revenue going forward. . . . With an extensive breadth of energy efficiency and renewable energy solutions, diversified markets, diversified customer base, national footprint and scalable infrastructure, we remain very optimistic on the future and our growth opportunities given the power of our diversified service platform.

148.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release.  The Form 10-Q was signed by Asplund and Mistarz.

149.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of September 30, 2010, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

150.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended September 30, 2010 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

151.    On March 10, 2011, Lime Energy issued a press release announcing its financial results for the fourth quarter of 2010, ending December 31, 2010, as well as twelve-month period ending December 31, 2010.  For the quarter, the Company reported revenues of $38.3 million and a GAAP net income of $1.9 million, or $0.08 per share.  For the year, the Company reported revenues of $95.7 million and a GAAP net loss of $5.2 million, or $0.22 per share.

152.    In the March 10, 2011 press release, Defendant Asplund was quoted as saying:

The fourth quarter of 2010 highlights the "Power of the Platform." . . . It illustrates what we have been saying for a while, that the key to us generating

sustained profitability is to deliver strong revenue growth, hold or improve our gross margins and control the growth of our SG&A. During the 4th quarter last year we increased our revenue by 89%, while decreasing our SG&A by 4.5% and increasing our gross margin by 6.4 percentage points, resulting in our first GAAP profit in the Company's history. On a full year basis, revenue grew 35%, gross margins by 15% while SG&A grew 8%. SG&A as a percentage of revenue fell to 27.0% of revenue compared to 33.8% for 2009. While this was a meaningful 20% reduction, we remain committed to reducing this to the mid-teens over the next several years. Since re-making the company in 2006, we have grown revenue three times faster than SG&A with revenue having grown at a 104.3% compounded annual growth rate (CAGR) while SG&A increased at a 29.9% CAGR. Getting to sustained profitability remains our top objective, and we took significant strides toward achieving this goal during 2010.

153.   That same day, the Company filed its Form 10-K with the SEC repeating the earnings results from the press release. The Form 10-K was signed by Defendants Asplund, Parke, Mistarz, Kiphart, Barnum, Capps, Carey, Glick, and Desmond.

154.   Under "Disclosure Controls and Procedures," the Form 10-K provided:

Our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2010, our disclosure controls and procedures were effective.

155.   Under "Management's Annual Report on Internal Control Over Financial Reporting," the Form 10-K provided, in relevant part:

As of the end of the period covered by this report, our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our internal control over financial reporting. In carrying out its evaluation, our management used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2010.

156.   Under "Changes in Internal Control Over Financial Reporting," the Form 10-K provided:

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2010 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

157.    On May 12, 2011, Lime Energy issued a press release announcing its financial results for the first quarter of 2011, ending March 31, 2011.  For the quarter, the Company reported revenues of $19.0 million and a GAAP net loss of $3.7 million, or $0.15 per share.

158.    In the May 12, 2011 press release, Defendant Asplund was quoted as saying:

We are pleased with our first quarter results that represent our highest reported first quarter revenues to date. . . . Revenue increased in all of our markets relative to last year demonstrating again, the "Power of the Platform."  Most notable, revenue from our utility demand side management programs increased 200% and revenue from our public sector market increased approximately 50%.  Revenue in our C&I market increased slightly even though the first quarter of the year is typically the lowest revenue quarter for this market.  Most important, we continued to demonstrate financial leverage with our operating loss declining almost 22% and our adjusted EBITDA loss declining almost 25% during the quarter as a result of the higher revenue, improvement in our gross margin, increased operational efficiencies and a 25% decline in SG&A as a percentage of revenue.


Sustained profitability remains our top objective in 2011. . . . We believe we are well positioned to achieve that objective with an operating platform that provides a broad array of energy efficiency and renewable energy solutions for a diversified base of utility, private and public sector clients.

159.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release.  The Form 10-Q was signed by Asplund and Mistarz.

160.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of March 31, 2011, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management,

including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

161.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended March 31, 2011 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

162.    On August 8, 2011, Lime Energy issued a press release announcing its financial results for the second quarter of 2011, ending June 30, 2011.  For the quarter, the Company reported revenues of $24.3 million and a GAAP net loss of $3.5 million, or $0.15 per share.

163.    In the August 8, 2011 press release, Defendant O'Rourke was quoted as saying:

Our results for the second quarter and first half of the year were in line with our expectations. . . . Our utility program management business continues to show strong growth, with revenue up 77% over the second quarter and 114% over the first six months of 2010.  . . . Our backlog of contracted and awarded business increased substantially during the quarter across all of our markets to almost $190 million, which is more than double what it was at the beginning of the year.

164.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release.  The Form 10-Q was signed by O'Rourke and Mistarz.

165.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of June 30, 2011, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

166.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended

June 30, 2011 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

167.    On November 8, 2011, Lime Energy issued a press release announcing its financial results for the third quarter of 2011, ending September 30, 2011.  For the quarter, the Company reported revenues of $32.2 million and a GAAP net income of $359 thousand, or $0.02 per share.

168.    In the November 8, 2011 press release, Defendant O'Rourke was quoted as saying:

> The business continues to perform well and is lining up for a strong finish to the year. . . . Increased revenue, improved gross margins and controlled growth in our SG&A contributed to generate the first GAAP profitable third quarter in the Company's history.  The restructuring we implemented in May is already paying dividends in the form of increased internal efficiencies as evidenced by the 1.9% increase in SG&A expense while revenues increased by 14.7% over the same period. . . . We enter the fourth quarter with a backlog of $227 million feeling confident about our ability to finish the year on a high note.

169.    That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release.  The Form 10-Q was signed by O'Rourke and Mistarz.

170.    Under "Disclosure Controls and Procedures," the Form 10-Q provided:

> Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of September 30, 2011, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

171.    Under "Changes in Internal Controls," the Form 10-Q provided:

> There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended September 30, 2011 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

172. On March 8, 2012, Lime Energy issued a press release announcing its financial results for the fourth quarter of 2011, ending December 31, 2011, as well as twelve-month period ending December 31, 2011. For the quarter, the Company reported revenues of $44.7 million and a GAAP net income of $4.7 million, or $0.20 per share. For the year, the Company reported revenues of $120.1 million and a GAAP net loss of $11.6 million, or $0.49 per share.

173. In the March 8, 2012 press release, Defendant O'Rourke was quoted as saying:

> Our businesses focused on the utility, public sector and federal markets performed very well during 2011, increasing their combined revenue by 42% and expanding their gross profit margins. . . . This was masked however, by the poor performance of our C&I business and the associated restructuring charge and asset impairment we took during the year. . . . In contrast to our expectations regarding the C&I market, we expect continued growth in revenue and profitability from our other businesses in 2012.

174. On March 16, 2012, the Company filed its Form 10-K with the SEC repeating the earnings results from the March 8, 2012 press release. The Form 10-K was signed by Defendants O'Rourke, Asplund, Mistarz, Kiphart, Barnum, Capps, Glick, and Desmond.

175. Under "Disclosure Controls and Procedures," the Form 10-K provided:

> Our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as amended) as of the end of the period covered by this report. Based on the evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2011, our disclosure controls and procedures were effective.

176. Under "Management's Annual Report on Internal Control Over Financial Reporting," the Form 10-K provided, in relevant part:

> As of the end of the period covered by this report, our management carried out an evaluation, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our internal control over financial reporting. In carrying out its evaluation, our management used the criteria set forth in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on its assessment, management concluded that our internal control over financial reporting was effective as of December 31, 2011.

177.    Under "Changes in Internal Control Over Financial Reporting," the Form 10-K provided:

There were no changes in our internal control over financial reporting during the quarter ended December 31, 2011 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

178.    On March 16, 2012, in an interview published by CEOCFO Magazine, Defendant O'Rourke emphasized the Company's "strategic plan" for increasing profitability:

**CEOCFO:** Mr. O'Rourke, you have been CEO for about a year and were COO before that; how, if in any way is Lime Energy changing under your leadership?

**Mr. O'Rourke:** Our vision and purpose has always been to build a clean energy future and that remains unchanged whether I am COO or CEO. As a leader in the company today, my responsibility is to execute our three-year strategic plan laid out in 2010 by the executive team and approved by our board.

**CEOCFO:** What is the Lime Energy strategic plan?

**Mr. O'Rourke:** Our strategic plan, at least in the near term, is to continue to drive profitability for a company that has been unprofitable until now. We intend to increase our profitability and revenue by focusing sharply on continuing to develop and expand our utility partnerships throughout the country, increasing our market share in the federal space and accelerating our product development activity. This will allow us to capitalize on the different emerging industry trends that are happening out there.

. . . .

**CEOCFO:** What is the financial picture for Lime Energy today?

**Mr. O'Rourke:** Our financial outlook is very strong right now. We anticipate being profitable in 2012, and at the end of the last quarter we reported a backlog of $226 million, of which $80 million will convert to revenue in 2012, so we are anticipating continued strong year-over-year growth for the next few years organically without any acquisitions.

**CEOCFO:** Why should potential investors pay attention to Lime Energy?

**Mr. O'Rourke:** Lime has built a platform that at present has tremendous reach for getting all of the different technologies into facilities. The investment opportunity that is now evolving is really the turn to profitability by emerging

clean energy companies, whose stocks are currently down. Our success in the utility space, our strong background and mature platform and the diversity across out platform has positioned Lime to capture a strong share of the refocusing energy market as it continues to evolve. In fact, two weeks ago one of the leading analyst blogs, Seeking Alpha, pointed out that with the combination of an attractive price and the publicity that we got from launching our sOccket partnership, it is no wonder that Lime Energy has topped many Green Investment "Buy" lists for 2012.

179. O'Rourke's statements as well as the Company's misleading financial statements caused analysts and the market to view the Company's stock positively. An article by John Downey in the Charlotte Business Journal, published on March 23, 2012, entitled "Analyst: Lime Energy in solid position, despite 4Q loss," exemplified those positive views:

Lime Energy Co. posted a net loss of $4.7 million in the fourth quarter of 2011. But analysts who follow the company say those results don't raise any red flags.

"If you look, they are outperforming their peers," says Craig Irwin, who follows Lime at Wedbush Securities in Los Angeles. "The headline number is not always the number you want to look at to figure out how the company is performing."

The loss appeared surprising after Lime reported a $359,000 profit in the third quarter and Chief Executive John O'Rourke confidently projected future profits for the fledgling clean-energy and energy-efficiency company.

O'Rourke remains confident and is still projecting profits. The current quarter may be slow, but the company expects to be profitable in the remaining three quarters of 2012 and will end the year with a net profit, he says.

. . . .

The company also stepped up its energy-efficiency services to small businesses as part of its division that provides efficiency programs for utilities to market for their customers. That has become the company's sweet spot, with Lime's utility-business revenue increasing nearly 42% in 2011 over 2010 levels.

Irwin sees that as Lime's key advantage over its poorer- performing competitors.

"The others have not got the business model to pursue this market as aggressively as Lime has," he says.

. . . .

O'Rourke says with the issues in Lime's commercial and industrial division now resolved, the way is clear for strong profits this year.

The company says it has a backlog of $234 million in its multi-year contracts with utilities and government agencies. Lime projects $116 million of that will turn into revenue this year.

That represents about 80% of the $143 million to $152 million Lime expects in revenue in 2012, O'Rourke says. And it's already under contract.

It's a strong argument for a good year, Irwin says.

"John's insistent that Lime will be profitable three of the four quarters of this year," he says. "This is a very seasonable business, so if he does that, it will be something. And we are looking to see them do that. We believe they can accomplish it."

180. Further exemplifying the positive view of the Company's stock by analysts, hedge fund investment strategist Bret Jensen disclosed on April 8, 2012 in an article published by Seeking Alpha his intent to invest in Lime Energy, despite his previous skepticism regarding stocks in the alternative energy sector:

I have never been a big fan of the alternative energy space for investing. First, the government subsidies that keep the sector afloat run[] counter to my fiscal conservative, small government ideology. It also always seems to create debacles as government is a terrible allocator of capital (see Solyndra). Finally, when government support is inevitably withdrawn the favored sector gets crushed.

. . . .

That being said, I am about to make my first investment in "clean" energy segment in a very long time as this stock's risk/reward profile is too good to pass up, in my opinion.

. . . .

7 reasons LIME is worth a flyer at under $3 a share:

1. It manufactures no product. Instead it provides services and consulting to entities initiating "green" projects.

2. Its main customers (governments, utilities, etc…) provide stable sources of revenues. Sales are predicted to increase around 20% in both FY2012 and FY2013.

3. Insiders have been net buyers of the stock over the last eight months.

4.   It finally turned operating cash flow positive in 4Q2011, it has net cash on the balance sheet and is priced at 58% of revenue.

5.   Only two analysts cover the stock.  One has a $7 price target and the other an $8 price target on LIME.

6.   The company is poised to sharply accelerate EPS in the next two years.  Although it lost 17 cents in FY2011, it is expected to make a 6 cent a profit in FY2012 and 21 cents a share in FY2013.

7.   The stock has long term technical support at just under current prices.

181.   On May 10, 2012, Lime Energy issued a press release announcing its financial results for the first quarter of 2012, ending March 31, 2012.  For the quarter, the Company reported revenues of $18.3 million and a GAAP net loss of $4.6 million, or $0.19 per share.  The Company also reiterated its guidance of $143 million for the year.

182.   In the May 10, 2012 press release, Defendant O'Rourke was quoted as saying:

The first quarter results were in line with our expectations for what has traditionally been our seasonally slowest quarter of the year. . . . The quarter's results included a 16% year-over-year increase in our core energy efficiency business, led by strong first quarter growth in our utility market segment. . . . We have added four new utility contracts since the beginning of the year, bringing our total utility contracts to seven from only two this time last year.  We are confident in our trajectory and expect a particularly strong second half as these utility programs ramp and further contribute to this year's expected results.

183.   That same day, the Company filed its Form 10-Q with the SEC repeating the earnings results from the press release.  The Form 10-Q was signed by O'Rourke and Mistarz.

184.   Under "Disclosure Controls and Procedures," the Form 10-Q provided:

Our management, including our chief executive officer and our chief financial officer, maintains our "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) and has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on such evaluation, our chief executive officer and chief financial officer have concluded that, as of March 31, 2012, such disclosure controls and procedures are effective for the purpose of ensuring that material information required to be in the reports that we submit, file, furnish or otherwise provide to the Securities and Exchange Commission is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

185.    Under "Changes in Internal Controls," the Form 10-Q provided:

There have not been any changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the quarter ended March 31, 2012 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

186.    The above statements were materially false or misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to the Individual Defendants or recklessly disregarded by them:

(1)    that the Company was improperly recording revenue, including the booking of non-existent revenue and booking revenue in an earlier period than it was earned;

(2)    that, as a result, the Company's revenue and financial results were overstated;

(3)    that, as such, the Company's financial statements were not prepared in accordance with GAAP;

(4)    that the Company lacked adequate internal and financial controls; and

(5)    that, as a result of the foregoing, the Company's financial statements were materially false or misleading at all relevant times.

## The Company Begins to Reveal the Truth

187.    On July 17, 2012, the Company issued a press release announcing that it had misreported revenue over the past two years.  The press release stated, in relevant part:

[T]he Audit Committee of the Board of Directors of Lime Energy Co. (the "Company") determined that the Company's consolidated financial statements on Form 10-K for the periods ended December 31, 2010 and December 31, 2011 and quarterly report on Form 10-Q for the period ended March 31, 2012 (the "affected financial statements") may no longer be relied upon.   The Audit Committee made that determination based on the results of a partial internal review conducted by the Company's management which was concluded on Friday, July 13, 2012.

Based on the results of that partial internal review the Company's management and the Audit Committee believe that some portion of the Company's revenue was improperly recorded.  *In some cases, it appears that non-existent revenue may have been recorded.  In other cases, it appears that revenue may have been recorded earlier than it should have been.*

188.    On the same day, the Company filed a Current Report on Form 8-K with the SEC, entitled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review," repeating the admissions contained in the press release.

189.    In reaction to the Company's July 17, 2012 disclosure, shares of the Company's stock fell $0.91 per share in one day, or 45%, to close at $1.12 per share.

190.    As Garvin Jabusch, Co-Founder and CIO of Green Alpha Advisors and manager of the Sierra Club Green Alpha Portfolio, explained in the aftermath:

> "*The revelation that the company may have recorded "non-existent revenue" is a major concern.*  Somewhat less concerning is "Revenue being reported earlier that it should have been," which is a violation of the matching principle, and is a relatively easy mistake to make and can be readily forgiven if properly restated. *But the term "non-existent revenue" is a major red flag...* There are only a couple of reasons phantom revenue could get booked, and most firms have controls in place to make sure that sources of revenue are verified before they're booked.  *So at the very least, we can say that there are material weaknesses in LIME's internal controls.  At worst, some relatively senior person may have misinformed the accounting team.*"

191.    Jabusch's concerns were echoed by other analysts.  For example, on July 17, 2012, Forbes published an article entitled "What Lime Energy's Earnings Restatement Means." In the article, analyst Tom Konrad states:

> Whenever a company's financial statements cannot be relied on, for whatever reason, it's not good.
>
> *Moving revenue forward to create the illusion of faster growth is far from harmless*, as it leads to nasty surprises on future dates, when the expected revenue should have been recorded, but is no longer there.  Recording revenue early is a fairly common form of book-fiddling, because the timing of revenue recognition always comes down to a judgment call.  Despite numerous accounting guidelines designed to ensure consistency in revenue recognition, it's always possible to tell oneself that recording revenue sooner is not really improper, even when it is. Most people like to think they are honest, and so they tend to use those forms of deception about which they can lie to themselves while they are lying to others.
>
> *Recording non-existent revenue is a different beast altogether.  If some "non-existent revenue may have been recorded," as the press release states, we're likely dealing with more than aggressive accounting.*  Although the company currently believes "that the cumulative adjustment to revenue for the affected

financial statements will not exceed $15 million" in revenues, ***I would not be surprised if the book-fiddling turns out to [be] much more extensive than misreporting of $15 million in revenue***.

192.    The disclosure that the Company's financial statements for the last two years might have to be restated put in perspective the Company's relative success over the past few years.  As Debra Fiakas, the Managing Director of Crystal Equity Research, an alternative research resource on small capitalization companies in selected industries, stated in an article published on July 25, 2012 by Alternative Energy Stocks:

> It is best to avoid corporate drama that involves unexpected resignations and unscheduled week-end board meetings.  At least that is my view.  However, the company soap operas can be entertaining, so I decided to tune into the Lime Energy, Inc. (LIME:  Nasdaq) saga.  Based in North Carolina, Lime provides a menu of energy-saving solutions to utilities and large-facility owners.  Lime's product and service menu includes energy efficient lighting upgrades, efficient mechanical and electrical retrofits, water conservation, building weatherization and other solutions that are aimed at reducing energy bills.

> Lime has been relatively successful - at least its revenue growth suggests it has been capturing market share.  Reported sales were $120.1 million in the year 2011, an impressive increase over $95.7 million in 2010 and $70.8 million in 2010. ***The problem: revenue is now in question.***  Last week the company filed a notice with the SEC that an internal investigation determined some revenue reported in the last two years were improperly recorded.  Some revenue was non-existent and other revenue was recorded too early.

> The stock dropped by 50% in the days following the announcement and the shareholder lawsuits and law firm investigations were still piling up a week later.  It is a reasonable reaction - reduce exposure to loss when financial reports are fraudulent.

> Six weeks earlier the chairman of Lime Energy's board of directors had resigned, ostensibly due to health reason.  Coupled with the revenue issue, the resignation added a bit of intrigue to the story and a hint of more wrongdoing.  So even though the amount of bogus and inaccurate revenue amounts to $15 million or less - that is no more than 7% of total revenue in the two-year period - ***the corrected share price reflects a far more significant problem.***

> ***It is a matter of trust.  Lime management should all be under suspicion, especially the chief financial officer, who has a bird's eye view on contracts, orders, billings and collections.***  The energy alternative market place is supposed to be filled with the good guys who are fighting to save the world from global

warming. Instead we find liars who misrepresent sales. *That it is only a 7% fudge makes no difference.*

193. The July 17, 2012 disclosure, however, was just the tip of the iceberg. On December 27, 2012, the Company issued a press release entitled "Lime Energy Announces Expansion of Internal Review." That press release stated, in pertinent part:

> [T]he Audit Committee of the Board of Directors of Lime Energy Co. (the "Company") determined that the Company's consolidated financial statements on Form 10-K for the years ended December 31, 2008 and December 31, 2009 (the "2008 - 2009 financial statements") may no longer be relied upon. The Audit Committee made that determination based on information discovered in the course of the Company's internal investigation of the misreporting of revenue for the years ended December 31, 2010 and December 31, 2011 and the quarter ended March 31, 2012 (the "2010 - 2012 financial statements" and collectively with the 2008 - 2009 financial statements, the "affected financial statements") previously reported in the Current Report on Form 8-K filed on July 17, 2012. *The Company's management and the Audit Committee believe that some portion of the Company's revenue for 2009 and 2008 was recognized earlier than permitted under generally accepted accounting principles.* Nothing has come to the attention of the Company's management or the Audit Committee that would cause them to believe that any of the misreported revenue recorded for 2009 and 2008 should not have been recorded in a later period.
>
> The Company cannot make a reliable estimate of the magnitude of the misreported revenue or the effects on the 2009 or 2008 financial statements at this time. *The Company does expect that the misreporting will require restatement of the 2009 financial statements, in addition to the restatement of the 2010 - 2012 financial statements.* The Company expects to promptly determine whether a restatement of the 2008 financial statement will be necessary.

194. In reaction to the December 27, 2012 disclosure, shares of the Company's stock fell approximately 7%, to close at $0.56 per share the following day.

195. On August 21, 2012, the Company issued a press release announcing that due to its failure to file Form 10-Q for the period ending June 30, 2012, it "received a letter from The NASDAQ OMX Group ("NASDAQ") indicating that the Company is not in compliance with the filing requirements for continued listing under NASDAQ Listing Rule 5250(c)."

196. November 26, 2012, the Company issued a press release announcing that due to its failure to file Form 10-Q for the period ending September 30, 2012, it received a second letter

from the SEC "indicating that the Company is not in compliance with the filing requirements for continued listing under NASDAQ Listing Rule 5250(c)."

197.    On January 14, 213, the Company issued a press release announcing that it received a determination letter from the NASDAQ's Listing Qualifications Department:

> The letter advises that because the Company remains noncompliant with the filing requirements for continued listing under Nasdaq Listing Rule 5250(c)(1) because the Company had not filed its Quarterly Reports on Form 10-Q for the periods ended June 30, 2012 and September 30, 2012 (the "delinquent filings"), trading of the Company's common stock would be subject to suspension and the Company's securities removed from listing and registration on the Nasdaq Stock Market on January 18, 2013.

> The Company has the right to appeal this determination and request a hearing before Nasdaq's Hearings Panel (the "Panel"), which it plans to do on or before January 16, 2013. The request for a hearing will automatically stay the suspension of trading and delisting of the Company's securities by Nasdaq for 15 days from the date of the Company's request. The Company also plans to request an extended stay of the suspension and delisting, pending the hearing, which Nasdaq may grant in its discretion.

> Following the hearing, the Panel has the authority under the Nasdaq Listing Rules to grant the Company an extension of time within which to regain compliance with the filing requirements for a period not to exceed 360 days from the original due date (August 14, 2012) of the first delayed filing. However, there can be no assurance that the Panel will grant the Company a stay of the Panel's delisting determination until the conclusion of the hearing process or that it will grant the additional time requested by the Company to regain compliance with Nasdaq's filing requirements.

198.    On January 30, 2013, the Company issued a press release announcing that by letter dated January 30, 2013, the NASDAQ Listing Qualifications Hearings Panel "has granted the Company's request to extend the stay of suspension of trading in the Company's common stock pending completion of the hearing process and the issuance of a final determination by the Panel regarding the Company's request for continued listing on NASDAQ."

199.    To date, the Company has not restated any of its misleading financial statements nor has it indicated by when it plans to do so. This has given analysts little to be positive about,

as was demonstrated in a recent article published by the Charlotte Business Journal on January

15, 2013 and entitled "Lime Energy could be delisted from NASDAQ in February":

> Lime had once hoped to complete a review of the misreporting by the end of 2012. The company said some $15 million appeared to have been falsified, but much of it was actually received in later quarters and had been improperly recorded as revenue before it was received.

> The company has not said how much in revenue was misreported for 2008 and 2009. But it says that revenue appears to have been reported early, and does not appear to be fictitious.

> Still, Lime says it cannot issue reliable financial statements until it resolves all of the revenue issues.

> "The company continues to work diligently to complete the accounting review of its financial statements contained in its periodic reports for the years ended December 31, 2008, 2009, 2010 and 2011, and the quarter ended March 31, 2012, and has made good progress toward completing this review," Lime says in a prepared statement.

200. Since the additional disclosures on December 27, 2012, shares of Lime Energy's

common stock have persistently traded below $1.00 per share.

## DAMAGES TO LIME ENERGY

201. Although NASDAQ Listing Qualifications Hearings Panel has granted the

Company's request to extend the stay of suspension of trading in the Company's common stock

pending completion of the hearing process and the issuance of a final determination, and

although it is yet not clear by how much the misleading financial statements will have to be

restated, Lime Energy has been, and will continue to be, severely damaged and injured by the

Individual Defendants' misconduct.

202. Further, as a direct and proximate result of the Individual Defendants' conduct,

Lime Energy has expended and will continue to expend significant sums of money. Such

expenditures include, but are not limited to:

(a) legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws;

(b) loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace;

(c) amounts paid to outside lawyers, accountants, and investigators in connection with Lime Energy's internal investigation; and

(d) loss of revenues and profits due to any subsequent restatements.

## DERIVATIVE ALLEGATIONS

203. Plaintiff brings this action for the benefit of Lime Energy to redress injuries suffered a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

204. Lime Energy is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

205. Plaintiff is and has been a Lime Energy shareholder since June 8, 2009. Plaintiff therefore will adequately and fairly represent the interests of Lime Energy in enforcing and prosecuting its rights.

## DEMAND FUTILITY ALLEGATIONS

206. A pre-suit demand on the Board of Lime Energy is futile and, therefore, excused. The current Board consists of the following six (6) individuals: Defendants Kiphart, Asplund, Glick, Barnum, Capps, and O'Rourke (collectively, the "Director Defendants"). Where, as here, the board is comprised of an even number of directors, the plaintiff need only demonstrate that half of the board is interested or lacks independence. Thus, Plaintiff need only allege demand futility as to three (3) of the six current directors.

207.    In this case, the Company's 2012 Proxy Statement indicates that the Company itself does not consider Defendants Asplund and O'Rourke to be "independent" because they also serve or have served as the Company's executive officers.  Moreover, both Defendant Asplund and Defendant O'Rourke are named as defendants in the related securities fraud class action, which renders their ability to impartially consider a demand even more doubtful.  Accordingly, a demand upon these Defendants is futile and, therefore, excused.

208.    Furthermore, demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

209.    Specifically, Defendant Asplund (as the former Chairman and CEO), Defendant Kiphart (as the former and current Chairman), and Defendant O'Rourke (as the current CEO) were ultimately responsible for the Company's operations, financial statements, and internal controls.  However, in complete abdication of their fiduciary duties, Defendants Asplund, Kiphart, and O'Rourke either participated in or were recklessly unaware of the fraudulent scheme to inflate the Company's earnings and revenue figures, which was intended to make the Company appear more profitable and attractive to investors.  As a result, Defendants Asplund, Kiphart, and O'Rourke breached their fiduciary duties.  Thus, Defendants Asplund, Kiphart, and O'Rourke face a substantial likelihood of liability, and demand upon them is futile.

210.    Likewise, Defendants Barnum and Capps, as members of the Audit Committee, reviewed and approved the false financial statements.  As members of the Audit Committee during the relevant period, Barnum and Capps had additional and heightened responsibilities for ensuring the reliability of financial reporting and compliance with applicable laws and regulations.  The Audit Committee was also tasked with reviewing the quality, adequacy, and effectiveness of the Company's internal and financial controls.  Barnum and Capps fell well short of their duties.  As alleged herein, Barnum and Capps knowingly or recklessly made and allowed the Company to make improper statements related to Lime Energy's financial results and business

operations. Barnum and Capps breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, Defendants Barnum and Capps face a substantial likelihood of liability for their breach of fiduciary duties. Because these Defendants face a substantial likelihood of liability, any demand upon them is futile.

211. Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. Specifically, the Code of Ethics required these Defendants to also adhere to Lime Energy's standards of business conduct. In particular, under the Code of Ethics, Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke were bound to ensure that "all transactions fully and accurately be recorded in the Company's books and records in compliance with all applicable laws." The Code explicitly states that "[f]alse or misleading entries, unrecorded funds or assets, or payments without appropriate supporting documentation and approval strictly are prohibited and violate Company policy and the law." It also required that "all documentation supporting a transaction fully and accurately should describe the nature of the transaction and be processed and recorded in a timely fashion." Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke did not comply with these requirements. As stated herein, Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke violated the Code of Ethics by causing the Company to make or allowing the Company to make improper financial and business disclosures in its public press releases and filings with the SEC. Because these Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

212. Moreover, as stated herein, Defendants Asplund, Kiphart, and Barnum signed the Company's March 10, 2009 Form 10-K. Accordingly, these Defendants face a substantial likelihood of liability for making and approving the misleading statements contained therein. As a result, any demand upon them is futile.

213. As further stated herein, Defendants Asplund, Kiphart, Barnum, Capps, and Glick signed the Company's March 23, 2010 Form 10-K. Accordingly, these Defendants face a

substantial likelihood of liability for making and approving the misleading statements contained therein. As a result, any demand upon them is futile.

214. As further stated herein, Defendants Asplund, Kiphart, Barnum, Capps, and Glick signed the Company's March 10, 2011 Form 10-K. Accordingly, these Defendants face a substantial likelihood of liability for making and approving the misleading statements contained therein. As a result, any demand upon them is futile.

215. In addition, as stated herein, the Company's March 8, 2012 Form 10-K was signed by Defendants O'Rourke, Asplund, Kiphart, Barnum, Capps, and Glick. Accordingly, these Defendants face a substantial likelihood of liability for making and approving the misleading statements contained therein. As a result, any demand upon them is futile.

216. Furthermore, Defendants O'Rourke and Asplund, as the Company's senior executive and financial officers, were likewise subject to the Code of Ethics. They similarly failed to properly adhere to the Code of Ethics. As detailed herein, O'Rourke and Asplund also knew or were reckless in not knowing that the Company greatly overstated its revenue and profits. Because Defendants O'Rourke and Asplund violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and thereby demand upon them is futile.

217. As stated herein, at various times, Defendants O'Rourke and Asplund also signed the Company's Form 10-Qs and Form 10-Ks. Accordingly, these Defendants face a substantial likelihood of liability for making and approving the misleading statements contained in those Forms. As a result, any demand upon them is futile.

218. Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke also breached their fiduciary duties of loyalty by either knowingly or recklessly making improper statements in the Company's press releases and SEC filings regarding the Company's financial results and business operations. In particular, these Defendants made improper statements regarding:

(a) the recording of non-existent revenue;

(b) the recording of revenue earlier than it was earned; and

(c) the effectiveness of the Company's internal controls over financial reporting.

These improper statements were made in bad faith and in furtherance of a scheme to conceal the true nature of the Company's business operations and financial results. Accordingly, Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke cannot impartially consider a demand to initiate litigation because they face a substantial likelihood of liability. Demand upon Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke is therefore futile.

219. Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke also breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal and financial controls in place to prevent the dissemination of improper public disclosures. As indicated by the multitude of improper statements alleged herein, Lime Energy did not have in place, or failed to properly implement, an effective system of internal financial controls. Indeed, Defendants Asplund, Barnum, Capps, Glick, Kiphart, and O'Rourke knowingly or recklessly disregarded any such controls in directly and/or indirectly issuing improper statements in the Company's press releases and filings with the SEC regarding the Company's financial results and business operations. Accordingly, these Defendants breached their fiduciary duties in failing to implement such financial controls and, therefore, face a substantial likelihood of liability. Demand upon them is futile.

220. Furthermore, demand in this case is excused because the current and former directors named as defendants in this action control the Company and are beholden to each other.

221. Specifically, the members of the Board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Board from adequately monitoring the Company's operations and calling into question the Individual Defendants' conduct:

    (a)    Defendants Glick and O'Rourke previously worked together at AEM, which was founded by Glick and subsequently acquired by Lime Energy. The acquisition of AEM by Lime Energy was partially funded by a loan from Defendant Kiphart. At various times, Glick and O'Rourke served as the President and CEO of AEM.

(b)     Defendants Kiphart and Capps were previously directors of Advanced Biotherapy, Inc., prior to its purchase by Lime Energy.  Kiphart was also the chairman of Advanced Biotherapy's board and owned the majority of its common stock;

(c)     Defendant Kiphart is the father-in-law of Defendant Capps, who is the President and CEO of KVG Partners LLC.  Kiphart is a principal and the largest investor of KVG Partners.

(d)     Defendant Kiphart is also the father-in-law of Defendant Valentine.

(e)     Defendants Kiphart, Asplund, Barnum, Capps, Mistarz, Parke, and Valentine have all made capital investments into the Company.

222.     Moreover, Defendant Kiphart dominates and controls the other Board members. As of the filing of the Company's 2012 Proxy Statement, Kiphart was the Company's largest stockholder and the beneficial owner of over 40% of the Company's common stock.  In addition, during the Relevant Period, Defendant Kiphart provided substantial financing and liquidity to the Company, which allowed it to continue its operations, despite its lack of profitability:

(a)     On March 12, 2008, the Company entered into a revolving credit note with Advanced Biotherapy and Defendant Kiphart.  This note was subsequently amended several times to increase the size of the note to $19 million.

(b)     On July 11, 2008, the Company entered into an agreement with Defendant Kiphart, whereby Kiphart "agreed to cause the issuance of certain letters of credit in an amount not to exceed $10 million, to support the issuance of surety bonds required under certain customer contracts."  The Company has agreed to pay Kiphart "a fee equal to 3-5/8% per annum on the average outstanding balance on letters of credit, or $300,000, whichever is greater."  The Company also agreed to indemnify Kiphart for any claims under the letters of credit.

(c)     On August 10, 2009, the Company entered into a $2 million revolving bridge line with Defendant Kiphart "to meet any potential liquidity needs [the Company] might have prior to the completion of [its] follow-on public offering of common

stock." On October 2, 2009, the Company terminated the bridge line, paying Kiphart a $70,000 termination fee.

Because the Company is substantially indebted to Defendant Kiphart with regard to its financing and continued liquidity, the remaining Director Defendants cannot act independently of Kiphart. As such, any demand would be futile and, therefore, is excused.

223. In addition, demand on the Director Defendants is futile because when given an opportunity to commence an internal investigation that would reveal the extent of the violations, and thus the potential harm to the Company, the Board so restricted the scope of the inquiry as to render it incomplete and ineffective. Even though more than seven months have passed since the initial disclosure that there were reporting violations and that some of the Company's financial statements would need to be restated, the Company has yet to quantify the magnitude of the violations, to restate any of its financial statements, or to bring an action against any of the Company's current or former officers and directors. Thus, because when given the opportunity to fully reveal the extent of wrongdoing and the magnitude of the misreporting, the Director Defendants instituted a needlessly restricted and ineffective investigation, demand is excused.

224. Lime Energy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants and the current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lime Energy any part of the damages Lime Energy suffered and will continue to suffer thereby. Thus, any demand on these Defendants would be futile.

225. Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith, intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

226. The acts complained of herein constitute violations of fiduciary duties owed by Lime Energy's officers and directors and these acts are incapable of ratification.

227. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged herein by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lime Energy. The directors' and officers' liability insurance policy covering the Director Defendants may contain provisions that eliminate coverage for any action brought directly by the Company against these Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Lime Energy, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

228. If there is no directors' and officers' liability insurance, then the current directors will not cause Lime Energy to sue the Individual Defendants named herein, since they will face a large uninsured individual liability. Accordingly, demand is futile as well.

229. Thus, for the reasons set forth above, at least a majority, if not all, of the Individual Defendants currently serving on the Board cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

230. Overall, the Company will undoubtedly expend millions of dollars in internal investigations, restating its financial statements, and defending the securities class actions. It may be liable for millions of dollars in damages if it loses or settles the related securities fraud class actions. Furthermore, the Company is potentially subject to governmental investigations

and permanent delisting by the NASDAQ. Moreover, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers. Its market capitalization has been severely diminished and its prospect of raising equity in the future is questionable. All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

## COUNT I

### Against Individual Defendants for Breach of Fiduciary Duties

231. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lime Energy's business and affairs, particularly with respect to issues regarding the Company's financial viability.

233. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

234. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Lime Energy.

235. In breach of their fiduciary duties owed to Lime Energy, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct the Company's public statements, and failed to properly oversee Lime Energy's business, rendering them personally liable to the Company for breaching their fiduciary duties.

236. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent its financial condition and they failed to correct the Company's public statements. Defendants had actual knowledge of the misrepresentations

and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Lime Energy's securities.

237. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

238. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lime Energy has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

### Against Individual Defendants for Abuse of Control

239. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Lime Energy, for which they are legally responsible.

241. As a direct and proximate result of the Individual Defendants' abuse of control, Lime Energy has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Lime Energy has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT III

### Against Individual Defendants for Gross Mismanagement

242.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

243.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lime Energy in a manner consistent with the operations of a publicly-held corporation.

244.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lime Energy has sustained and will continue to sustain significant damages.

245.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

246.    Plaintiff, on behalf of Lime Energy, has no adequate remedy at law.

## COUNT IV

### Against Individual Defendants for Unjust Enrichment

247.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

248.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lime Energy.

249.    During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from Lime Energy that was tied to the financial performance of Lime Energy or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

250.    Plaintiff, as shareholder and representative of Lime Energy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Lime Energy and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Lime Energy;

C.     Determining and awarding to Lime Energy the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.     Directing Lime Energy and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lime Energy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Lime Energy to nominate at least three candidates for election to the Board; and

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

E.     Awarding Lime Energy restitution from defendants, and each of them;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court may deem just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a jury trial.

Dated: March 5, 2013

ERIC L. LAWTON, Derivatively on Behalf of
LIME ENERGY CO.,

/s/ Edward T. Joyce
One of his attorneys.

Edward T. Joyce
Rowena T. Parma
THE LAW OFFICES OF EDWARD T. JOYCE
& ASSOCIATES, PC
135 South La Salle Street, Suite 2200
Chicago, Illinois 60603
Telephone:  (312) 641-2600
Facsimile:  (312) 641-0360

Frank A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile:  (858) 914-2002

## VERIFICATION

I, Eric L. Lawton, verify that I am a shareholder of Nominal Defendant Lime energy Co. (the "Company"). I have reviewed the allegations made in this Verified Shareholder Derivative Complaint (the "Complaint"). As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the Complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 28, 2013

_____
Eric L. Lawton